# United States Court of Appeals
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 19-51173   Cranor v. 5 Star Nutrition
                         USDC No. 1:19-CV-908

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                      Sincerely,

                      LYLE W. CAYCE, Clerk

                      By: _____
                      Melissa V. Mattingly, Deputy Clerk
                      504-310-7719

cc w/encl:
    Keith J. Keogh
    Mr. David Philip Whittlesey

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
May 26, 2021
Lyle W. Cayce
Clerk

No. 19-51173

Lucas Cranor, *individually and on behalf of all others similarly situated*,

*Plaintiff—Appellant*,

*versus*

5 Star Nutrition, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-908

Before Davis, Stewart, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

    Robocalls and robotexts are nuisances. Congress banned them in the Telephone Consumer Protection Act of 1991 ("TCPA"). But as every American knows, there are companies—like the defendant in this case—who refuse to get that message while collectively sending millions of others. The question presented is whether one of the defendant's victims has an Article III injury sufficient to support standing for a claim under the TCPA. He does.

No. 19-51173

I.

A.

The TCPA prohibits four telemarketing practices. First, it prohibits using an "automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice" to call:

(i) an emergency telephone line;

(ii) a guest room or patient room of a hospital or other healthcare facility; or

(iii) any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A). Second, the Act proscribes using "an artificial or prerecorded voice to deliver a message" to "any residential telephone line" without prior consent. *Id.* § 227(b)(1)(B). Third, the Act prohibits sending certain unsolicited advertisements to fax machines. *Id.* § 227(b)(1)(C). Fourth and finally, the Act prohibits using an ATDS to tie up more than one business line simultaneously. *Id.* § 227(b)(1)(D).

To enforce these provisions, the TCPA creates a private right of action. The act authorizes "[a] person" to bring "an action based on a violation of [the Act] or the regulations prescribed [thereunder]" to "enjoin such violation," to "recover for actual monetary loss from such a violation, to "receive $500 in damages for each such violation," or to seek both damages and injunctive relief. *Id.* § 227(b)(3).

No. 19-51173

B.

The two parties to this case are Lucas Cranor, a Missouri citizen, and 5 Star Nutrition, a Delaware corporation with its principal place of business in Austin, Texas.

In June 2018, Cranor made a purchase at 5 Star's Austin location. While there, Cranor provided 5 Star with his cell phone number. The company later sent Cranor a series of unsolicited advertising text messages. The first came that same month—5 Star advertised a rewards program and asked Cranor to join. Another unsolicited text came a few months later, advertising a 50-percent-off sale. Cranor responded with a "STOP" request. After a dispute ensued, the two parties entered into a pre-suit settlement agreement (the "Settlement") to avoid litigation. In the Settlement, both parties agreed to waive any "causes of action, claims, [or] counterclaims . . . direct or indirect . . . with respect to the Dispute and/or any facts or circumstances involved in or related to the Dispute." 5 Star agreed to pay Cranor $1,000 in exchange for the waiver. The parties executed the Settlement on November 29, 2018.

Yet 5 Star persisted. It sent Cranor *another* text promoting a sale at its chain locations. He again responded with a "STOP" request. 5 Star dutifully stopped. Cranor nonetheless filed a class action complaint in the Western District of Texas, alleging that 5 Star "negligently, willfully[,] and/or knowingly sen[t] text messages to [Cranor's] cellular telephone number using an automatic telephone dialing system . . . without prior express consent, in violation of the [TCPA]." According to Cranor, the unsolicited text message caused him "the very harm that Congress sought to prevent [in enacting the TCPA]—namely, a nuisance and invasion of privacy." He further alleged that the text message "trespassed upon and interfered with [Cranor's] rights and interests in his cellular telephone and cellular telephone

line, and intruded upon [his] seclusion." And the text "harmed [Cranor] by depleting the battery life on his cellular telephone, and by using minutes allocated to [him] by his cellular telephone service provider." Cranor sought declaratory, injunctive, and monetary relief, as well as certification of a class pursuant to Federal Rule of Civil Procedure 23.

The district court dismissed the complaint for lack of standing. The court first found that "text messages are sufficient forms of injury in fact in actions arising out of the [TCPA]." But it concluded "the single text message here does not constitute [an] injury in fact." That's because a "single unwelcome text message will not always involve an intrusion into the privacy of the home in the same way that a voice call to a residential line necessarily does." The court therefore dismissed the complaint under Federal Rule of Civil Procedure 12(b)(1).

Cranor timely appealed. Our review is de novo. *See Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013).

## II.

Article III of the United States Constitution limits the judicial power to "Cases" and "Controversies." U.S. CONST. art. III, § 2. To invoke that power, a plaintiff must satisfy the tripartite "irreducible constitutional minimum" for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have an injury in fact; that injury must be traceable to the challenged conduct of the defendant; and a favorable judgment must be likely to redress that injury. *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016).

This is a case about standing's first requirement—injury in fact. To establish injury in fact, a plaintiff must show he "suffered an invasion of a legally protected interest that is concrete and particularized." *Spokeo*, 136 S. Ct. at 1548 (quotation omitted). But concrete does not mean tangible. "Although tangible injuries are perhaps easier to recognize[,] . . . intangible

injuries can nevertheless be concrete." *Id*. at 1549. When a plaintiff asserts harm to an intangible interest, we look to "both history and the judgment of Congress" to determine whether that injury satisfies Article III's constitutional minimum. *Ibid*.

We conclude Cranor has alleged a cognizable injury in fact: nuisance arising out of an unsolicited text advertisement. We start with Congress's judgment, then consider the history of analogous common law actions.

A.

As the branch charged with lawmaking, "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Ibid*. Its judgment is therefore "instructive and important." *Ibid*. Here, the text of the TCPA shows Congress determined that nuisance arising out of unsolicited telemarketing constitutes a cognizable injury.

In enacting the TCPA, Congress found that "unrestricted telemarketing can be an intrusive invasion of privacy" and a "nuisance." Pub. L. No. 102–243, § 2, ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991); *see also Salcedo v. Hanna*, 936 F.3d 1162, 1168 n.6 (11th Cir. 2019) ("[B]ecause the Supreme Court has instructed us to consider the judgment of Congress in assessing Article III standing, we will consider the congressionally enacted findings as informative of that judgment." (quotation omitted)). The Act itself was prompted by consumer outrage at the "proliferation of intrusive, nuisance" calls from telemarketers. TCPA § 2, ¶ 6. A balance had to be struck between "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade" so as to "protect the privacy of individuals and permit[] legitimate telemarketing practices." *Id.* ¶ 9. In Congress's view, the only way to achieve that end was to completely ban certain types of calls, while permitting the FCC regulatory flexibility to allow others not at issue

here. *Id.* ¶ 12. Cranor's asserted injury is thus exactly the one Congress sought to remediate in enacting the Act.

Addressing similar facts, some of our sister circuits have reached the same conclusion: "[T]elemarketing text messages . . . present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *see also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (holding that invasion of privacy arising out of unwanted text messages is "the very harm that the Act is designed to prevent"); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (same); *cf. Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (concluding that "nuisance and invasion of privacy" arising out of a "single prerecorded telephone call" are "the very harm that Congress sought to prevent" (quotation omitted)).

On the other hand, the Eleventh Circuit seized on the fact that some of the TCPA's legislative findings refer to "*residential* telephone subscribers" and banning telemarketing calls "to the *home*." TCPA § 2, ¶¶ 10, 12 (emphases added); *see Salcedo*, 936 F.3d at 1169. In the Eleventh Circuit's view, "Congress's legislative findings about telemarketing suggest that the receipt of a single text message is qualitatively different from the kinds of things Congress was concerned about when it enacted the TCPA." *Salcedo*, 936 F.3d at 1169. We reject this reasoning for three reasons.

First, the TCPA expressly covers cellular phones. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting unsolicited ATDS calls "to any telephone number assigned to a . . . cellular telephone service"). The TCPA also includes text messaging in its prohibitions on transmitting false caller ID information. *See id.* § 227(e)(1). If the statute only prohibited nuisances *in the*

*home*, then it would make little sense to prohibit telemarketing to mobile devices designed for use *outside the home*.

Second, the TCPA addresses "nuisance and invasion of privacy" in a variety of other non-residential contexts. The Act prohibits ATDS or prerecorded calls to, *inter alia*, (1) "any emergency telephone line," (2) "the telephone line of any guest room or patient room of a hospital," or (3) "a paging service." *Id.* § 227(b)(1)(A). It further proscribes using a fax machine or computer to send an unsolicited fax advertisement. *Id.* § 227(b)(1)(C). And the Act makes it unlawful to use an ATDS "in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." *Id.* § 227(b)(1)(D). The text of the Act thus shows Congress sought to remediate "nuisance and invasion of privacy" in a broader set of circumstances, not just in the home.

Third, Congress delegated authority to the FCC to "prescribe regulations" implementing the TCPA, *id.* § 227(b)(2), and to exempt commercial calls only where such exemptions "will not adversely affect the privacy rights" the TCPA protects, *id.* § 227(b)(2)(B)(ii). It did so after finding that the FCC "should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." TCPA § 2, ¶ 13. No part of this delegation limits the FCC to considering nuisances and privacy only in the home.

Given all this, we think the TCPA cannot be read to regulate unsolicited telemarketing only when it affects the home.

B.

We next look to history. Because the case-or-controversy requirement is "grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or

American courts." *Spokeo*, 136 S. Ct. at 1549. Here, Cranor's asserted injury has a close relationship to a harm actionable at common law: public nuisance.

A public nuisance is an "unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS § 821B (Am. L. Inst. 1979). That broad category encompasses any "act not warranted by law, or omission to discharge a legal duty, which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Ibid.* (quotation omitted). As a leading treatise explains:

> [Public nuisance] includes interferences with the public health, as in the case of a hogpen, the keeping of diseased animals, or a malarial pond . . . ; with public morals, as in the case of houses of prostitution, illegal liquor establishments, [or] gambling houses . . . ; with the public peace, as by loud and disturbing noises, or an opera performance which threatens to cause a riot; with the public comfort, as in the case of bad odors, smoke, dust and vibration.

W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 90, at 643–44 (5th ed. 1984) (footnotes omitted); *see also* 66 C.J.S. NUISANCES § 9 (1950) ("A public nuisance is characteristically broad in scope, affecting an entire neighborhood or community, the local community, the public at large or community at large, public rights, rights common to the general public, a public place, collective social interests, or the rights enjoyed by citizens as part of the public or to which every citizen is entitled . . . ." (footnotes omitted)).

Traditionally, the sovereign would address a public nuisance through "criminal prosecution and abatement by way of an injunctive decree or order." PROSSER & KEETON, *supra*, at 643. A private citizen could also sue, but only if he "could show that he had suffered damage particular to him[] and not shared in common by the rest of the public." *Id.* at 646; *Soap*

8

*Corp. of Am. v. Reynolds*, 178 F.2d 503, 506 (5th Cir. 1949) ("[A]n individual can neither abate, nor recover damages for, a public nuisance, unless he can show that he has sustained therefrom damage of a special character, distinct and different from the injuries suffered by the public generally."); *cf. Spokeo*, 136 S. Ct. at 1548 ("For an injury to be particularized, it must affect the plaintiff in a personal and individual way." (quotation omitted)).

Here, Cranor's injury "has a close relationship to" common law public nuisance. *Spokeo*, 136 S. Ct. at 1549. Cranor wants to use our Nation's telecommunications infrastructure without harassment. In that sense, he's similar to someone who wants to use another piece of infrastructure like a road or bridge without confronting a malarial pond, obnoxious noises, or disgusting odors. *See, e.g.*, *Commonwealth v. Allen*, 23 A. 1115, 1116 (Pa. 1892) (quarry operator created public nuisance by inhibiting public's use of road and bridges with "traction engine"); 66 C.J.S. NUISANCES § 9 (collecting cases). And 5 Star is similar to someone who illegally emits pollution or disease that damages members of the public. *See Cent. Ga. Power Co. v. State*, 73 S.E. 688, 688–89 (Ga. Ct. App. 1912) (power company caused public nuisance by creating a malarial pond).

Moreover, Cranor alleges a special harm not suffered by the public at large. As Congress acknowledged in enacting the TCPA, some members of the general public might be able to avoid robodialed advertisements—but not everyone can: "Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly . . . [and] place an inordinate burden on the consumer." TCPA § 2, ¶ 12. And Cranor alleges he's in that latter group: 5 Star's "aggravating and annoying text messages trespassed upon and interfered with Plaintiff's rights and interests in his cellular telephone." After receiving the unwanted text, Cranor was prompted to read the message and send a "STOP" request. The text itself "deplet[ed] the battery life on [Cranor's] cellular telephone and . . . us[ed] minutes allocated

to [him] by his cellular telephone service provider." Thus, not only has Cranor alleged an unreasonable interference with a right common to the public, he also has alleged personal injuries that separate him from the public at large.

That's enough to show a "close relationship" between his injury and an actionable public nuisance at common law. *See Spokeo*, 136 S. Ct. at 1549.

### III.

On similar facts, the Eleventh Circuit concluded there is no common law analogue to the harm of receiving an unwanted robotexted advertisement. In its view, a single text message is "the kind of fleeting infraction upon personal property that tort law has resisted addressing." *Salcedo*, 936 F.3d at 1172. Liability for trespass to chattels, for example, would arise "only when 'the possessor is deprived of the use of the chattel for a substantial time' or when the trespass harms 'the possessor's materially valuable interest in the physical condition, quality, or value of the chattel.'" *Ibid.* (quoting RESTATEMENT (SECOND) OF TORTS § 218(c) & cmt. e (Am. L. Inst. 1965)). Putting aside that *Salcedo* never addressed public nuisance, that view is mistaken for at least two reasons.

First, *Salcedo*'s view of trespass to chattels is substantially narrower than the scope of that action at common law. As Justice Alito recently explained, "[a]t common law, a suit for trespass to chattels could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels.'" *United States v. Jones*, 565 U.S. 400, 419 n.2 (2012) (Alito, J., concurring in the judgment) (quoting PROSSER & KEETON, *supra*, at 87). In practice, that meant "trespass to chattels [was] actionable *per se* without any proof of actual damage." JOHN W. SALMOND, LAW OF TORTS: A TREATISE ON THE ENGLISH LAW OF LIABILITY FOR CIVIL INJURIES 331 (1907). An action might lie even where, as here, the alleged

tortfeasor never physically touched the claimant's property. *See ibid.* (explaining that "[i]t is presumably a trespass willfully to frighten a horse so that it runs away"); *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 507 (C.C.D. Me. 1838) (Story, J.) ("[E]very injury imports damage in the nature of it; and, if no other damage is established, the party injured is entitled to a verdict for nominal damages."). By contrast, "today there must be 'some actual damage to the chattel before the action can be maintained.'" *Jones*, 565 U.S. at 419 n.2 (Alito, J., concurring in the judgment) (quoting PROSSER & KEETON, *supra*, at 87). *Salcedo* thus mistakes the twentieth-century Restatement for the eighteenth-century common law.

Second, *Salcedo*'s focus on the substantiality of the harm in receiving a single text misunderstands *Spokeo*. Our historical inquiry asks whether "an alleged intangible harm *has a close relationship to* a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549 (emphasis added). That is, "[o]ur inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019); *accord Gadelhak*, 950 F.3d at 462–63 ("[W]hile the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy."). *Salcedo*'s focus on the substantiality of an alleged harm threatens to make this already difficult area of law even more unmanageable. We therefore reject it.

\* \* \*

The district court's dismissal of Cranor's complaint is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

11



Certified as a true copy and issued
as the mandate on Jun 17, 2021
Attest:
Clerk, U.S. Court of Appeals, Fifth Circuit

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
May 26, 2021
Lyle W. Cayce
Clerk

No. 19-51173

_____

LUCAS CRANOR, INDIVIDUALLY AND *on behalf of* ALL OTHERS SIMILARLY SITUATED,

*Plaintiff—Appellant*,

versus

5 STAR NUTRITION, L.L.C.,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-908

_____

Before DAVIS, STEWART, and OLDHAM, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that Appellee pay to Appellant the costs on appeal to be taxed by the Clerk of this Court.